In Re: The Nomination Petition of Frank SHIMKUS for the Office of State Representative for the 113th District.

Joseph Pilchesky and Joanne Pilchesky, Petitioners.

In Re: Nomination Petition of Frank Andrew Shimkus, Candidate for the Democratic Nomination in the General Assembly from the 113th District.

Kevin Murphy, Petitioner.

Commonwealth Court of Pennsylvania.

Heard Feb. 28, 2008.

Decided March 14, 2008.

Publication Ordered March 31, 2008.

Joseph and Joanne Pilchesky, Scranton, for petitioners, Joseph and Joanne Pilchesky.

Christopher P. Cullen, Scranton, for petitioner, Kevin Murphy.

James F. Tierney, Scranton, for respondent, Frank Shimkus.

OPINION BY Judge COHN JUBELIRER.

Joseph and Joanne Pilchesky (Pilcheskys) and Kevin Murphy (collectively, Objectors) have filed objections to the Nomination Petitions of Frank Shimkus (Candidate) for the Democratic nomination for representative in the General Assembly for the 113th Legislative District. We consolidate the two filings for the purpose of this opinion.

Objectors allege that Candidate's Affidavit (Affidavit), Statement of Financial Interests (SOFI) and Nomination Petitions are defective because Candidate indicated on all of them an address, which is not his true residence, in order to deceive

the public. Specifically, Pilcheskys allege that Candidate provided a false address to deflect negative attention because Candidate, who is also a pastor, was living with his fiancée to whom he was not married.[1] Pilcheskys also allege that Candidate's SOFI is defective because Candidate intentionally failed to list his two other professions, insurance agent and pastor, and that he also failed to indicate that he is self-employed as a pastor. In opposition to the allegation that his address indicated on his Nomination Petitions, Affidavit and SOFI was a defect, Candidate contends that he indicated the correct address because he: occasionally stayed at the address in question; received mail at the address in question; notified his employer that his residence was the address in question; and changed his voter registration information to indicate his residence as the address in question. Nomination petitions are presumed to be valid, and objectors bear the heavy burden of demonstrating that a candidate's nomination petition is invalid. *In re Nomination Petition of Pippy*, 711 A.2d 1048, 1057 (Pa.Cmwlth. 1998). Thus, an objector has the burden of proving that a candidate's affidavit is false with regard to statements about residency. *In re Nomination Petition of Cooper*, 163 Pa.Cmwlth. 430, 643 A.2d 717, 720 (1994).

This Court scheduled a hearing on the objections for February 28, 2008, at 10:00 a.m. Prior to the hearing, Candidate submitted to the Court answers to the objections and a memorandum of law in support of his position, and the Objectors each submitted a memorandum of law in support of their respective positions. Based on the notes taken by the Court,[2] five witnesses testified at the hearing: Candidate; Edward Decker; Jennifer Coar; Tony Grande; and Mr. Murphy.[3]

## I. Testimony and Evidence Submitted at the Hearing

Candidate testified that he circulated petitions on his own behalf on January 31, 2008, February 6, 2008, and February 7, 2008, in which he indicated that his address is 2409 Boulevard Avenue, Scranton, Pennsylvania (Boulevard Address). Candidate testified that he filed his Affidavit on February 12, 2008, which also indicated the Boulevard Address. Candidate additionally acknowledged that he filed his SOFI on February 7, 2008, which identifies the Boulevard Address as his true residence. Candidate further confirmed that, in Block No. 6 of the SOFI requesting "Occupation or Profession," he only listed representative in the General Assembly. Moreover, Candidate confirmed that, in Block No. 13 requesting "Office, Director-

---

1. Pilcheskys allege more specifically that Candidate provided a false address:

   to deflect unwanted and controversial political attention from the fact that the Candidate/Pastor and Gabrielle Prutisto, his fiancée who is nearly thirty (30) years his junior, had purchased a lavish, expensive new home together in which to live while they were not married, and afterward, as to avoid public disgrace and humiliation, and therefore avoid the public's and church parishioner's [sic] moral and ethical scrutiny via media and internet exposure, and therefore to avoid substantial loss

   of voter confidence and public trust, and therefore to avoid loss of votes and serious potential of loss of election.

   (Pilcheskys' Petition to Set Aside Nomination Petition of Shimkus at ¶ 51.)

2. Due to the expedited nature of this case, this Court notes that it has not received the official hearing transcript.

3. For ease of following the facts of this case, the testimony of the witnesses is presented in an order that is different than that in which it was presented at the hearing.

ship or Employment in any Business," he checked the box indicating "none."

With regard to his residency, Candidate testified that he lived at 602 Applewood Acres, Clarks Summit, Pennsylvania (Applewood Address) for three years before moving to the Boulevard Address in October 2007. He also testified that he and his fiancée, Gabrielle A. Prutisto, purchased a new home at 310 Varsity Drive, Throop, Pennsylvania (Varsity Address) on November 1, 2007. Candidate testified that his daughter and son-in-law, Mr. and Mrs. Decker, own the home located at the Boulevard Address and that they moved out of the Boulevard Address, leaving it vacant, as of July 2007. Candidate testified that, when he initially moved out of the Applewood Address, he moved some furniture to the Varsity Address and some to the Boulevard Address. He stated that he moved a sofa, loveseat, kitchen table, television and VHS tapes to the Boulevard Address. Candidate testified, however, that over a period of time, he also began moving boxes of blankets, pillows and clothes into the Boulevard Address. Candidate explained that the mortgage and utility bills for the Boulevard Address are all in the Deckers' name. Candidate testified that he "stayed" at the Boulevard Address following his departure from the Applewood Address from October 2007 until the day before the hearing on February 27, 2008, when he moved to the Varsity Address. Candidate further testified that at no point did he pay rent or sign a lease while staying at the Boulevard Address. Instead, he stated that he was staying there to help out Mr. and Mrs. Decker by paying the utility bills. Candidate also testified: that the United States Postal Service delivered mail to him at the Boulevard Address;[4] that he changed his mailing address on his voter registration and with his employer, the Pennsylvania House of Representatives, to reflect the Boulevard Address;[5] and that he was served by Objectors in person at the Boulevard Address. However, he admitted that he never notified the Department of Transportation to have his driver's license reflect his residence at the Boulevard Address.

Candidate testified that he and his fiancée, Ms. Prutisto, purchased a home at the Varsity Address on November 1, 2007, for $370,000.00, and that he was proud to make his relationship with Ms. Prutisto public information. Together, Candidate and Ms. Prutisto executed their first mortgage, in the amount of $296,000.00, on November 2, 2007, and they executed a second mortgage, in the amount of $64,640.00, on November 26, 2007. Candidate testified that Ms. Prutisto moved into the Varsity Address soon after purchasing it. Candidate testified that he made the decision not to live at the Varsity Address with Ms. Prutisto and, instead, stayed at the Boulevard Address because he and Ms. Prutisto were not yet married. Upon questioning with regard to Petitioner Murphy's Exhibit 8, a press release dated March 29, 2007, Candidate agreed that, at that time, Ms. Prutisto had been working

---

**4.** We note that in support of Candidate's statement that the United States Postal Service delivers mail to him at the Boulevard Address, Candidate submitted envelopes from his bank, credit union, Pilcheskys, this Court, an insurance carrier, United Spinal Association, and the American Red Cross. (Shimkus Exs. 5, 6, 7, 9, 10, and 12.)

**5.** We note that in support of Candidate's testimony that he changed his residence to the Boulevard Address, Candidate submitted tax form 1099 with Trinity Congregational Church as the payer (Shimkus Ex. 1); W-2 Wage and Tax Statement for 2007 as being employed by the House of Representatives (Shimkus Ex. 2); voter registration form (Shimkus Ex. 3-4); and Candidate's employee contact information (Shimkus Ex. 8).

full-time for the Democratic Communications Office, but stated that she is now working for Member Services of the Democratic Caucus in Harrisburg.

Candidate testified that November and December of 2007 were busy months for members of the General Assembly. Candidate testified that he spent a good portion of time working in Harrisburg and living out of the trunk of his car and various Harrisburg area hotel rooms. When questioned as to how often he stayed at the Boulevard Address, Candidate initially testified that he stayed there a couple times a week and later testified that he stayed there once a week. Candidate could not remember exactly where he was on specific dates when questioned. Candidate did testify, however, that in mid-December 2007, he was injured while he was shoveling snow when he fell and hurt his knee and head, causing a concussion and sinus problems. Candidate testified that one week after this fall, while working on his new home at the Varsity Address, he fell again and sustained a second concussion. Candidate went on to testify that he was hospitalized for four days and, once released, could not stay by himself because he was a fall risk. Candidate testified that, because of his condition, he moved to his home at the Varsity Address with Ms. Prutisto for four to six weeks from December 17, 2007 until nearly the end of January. Candidate testified that, during the last week of January, he was away from the area on a week long retreat. Candidate testified that upon returning from the retreat, he moved into the Boulevard Address just for the month of February and had always intended to return to the Boulevard Address.

Candidate testified that he moved from the Boulevard Address to the Varsity Address on February 27, 2008, even though he was not yet married to Ms. Prutisto. When questioned as to why he moved to the Varsity Address, thereby reversing his intention not to live with Ms. Prutisto before being married, Candidate testified that he moved to the Varsity Address to protect his children from political machinations and alleged attacks upon him and his family, and that he would "let them take their best shot." [6]

Candidate also submitted testimony regarding Pilcheskys' assertion that Candidate's SOFI is defective for failing to list other professions and the fact that he was self-employed. Candidate testified that Block No. 6, requesting occupation or profession, only reflected that he is a member of the General Assembly. However, Candidate admitted that he is also a pastor for Trinity Congregational Church, a duty which he performs on a part-time basis. Candidate stated that, although he did not indicate he was a pastor, he did indicate that Trinity Congregational Church was a source of income in Block No. 10. Candidate testified that he did not indicate in Block No. 6 that he was a licensed insurance agent because he did not consider his license to be active. He also testified that he did not consider an insurance agent to be his profession because he did not use his insurance license in 2007. Finally, with regard to Block No. 13, requesting employment in any other business, Candidate testified that he was not self-employed as a pastor because Trinity Congregational Church was his employer. Candidate explained that a 1099/W2 tax form was not attached to the SOFI reflecting his income from Trinity Congregational Church be-

6. Specifically, Candidate testified that, recently, unknown individuals have been spying at the Boulevard Address and the Varsity Address and that a window was broken at the Varsity Address from the inside of the home.

cause an employee at the Ethics Commission detached the form and gave it back to Candidate indicating that it did not need to be submitted.

Candidate's son-in-law, Mr. Decker, also testified regarding Candidate's residency. Mr. Decker testified that Candidate "sometimes stayed" at the Boulevard Address.[7] Although Candidate never signed a lease for, or paid rent on, the Boulevard Address, Mr. Decker claimed that Candidate did pay utility bills, which were in Mr. Decker's name. Upon being questioned, Mr. Decker was unable to remember which utilities were still turned on at the Boulevard address. Mr. Decker testified that he and his wife moved out of the Boulevard Address sometime in July 2007 and put the home up for sale at that time. The home was under contract in October 2007, pending sale, when the sale fell through. Subsequently, the home went back up for sale in October 2007. Mr. Decker testified that when the home went back up for sale, the contract for sale with the listing agent stated that the listing agent must give 24 hours' notice before showing the home. According to Mr. Decker, this was done to give sufficient notice to Candidate. Mr. Decker testified that, in mid-January 2008, he signed a one-year lease agreement with Ms. Coar, which was to begin on March 1, 2008. Ms. Coar gave him a down payment in January, which Mr. Decker accepted and deposited. Mr. Decker gave Ms. Coar the combination to the lockbox for the home at the Boulevard Address, in mid-January, so that she could enter the home at will to begin to paint and to move in her possessions. Mr. Decker testified that he had

told Ms. Coar that his father-in-law sometimes "stayed" there.

Ms. Coar, tenant of Mr. Decker, also testified at the hearing. Ms. Coar testified that, in January 2008, she signed a one-year lease agreement for the Boulevard Address to commence March 1, 2008, and that she submitted the first part of her security deposit on January 22, 2008. Upon receiving Ms. Coar's initial deposit, Mr. Decker gave Ms. Coar permission to enter the Boulevard Address to begin painting different rooms of the house and to begin moving in her possessions. Ms. Coar stated that Mr. Decker also told her that his father-in-law "sometimes stays there." Ms. Coar testified that at no point did she have to give Mr. Decker 24 hours' notice, or any notice, prior to entering the Boulevard Address. She testified that there was no restriction placed on her painting and that she was denied access only once, when the home was being shown for sale purposes, before it was taken off the market.

When Ms. Coar was first shown the Boulevard Address by Mr. Decker, she testified that, in mid-January, she inspected all of the rooms and closets. Ms. Coar testified that, based upon this inspection, the only things located inside the Boulevard Address included a sofa, futon, entertainment center, television, kitchen table, chairs, children's clothes in some of the closets, VHS tapes, and one towel in the first floor bathroom. Ms. Coar stated that she did not see any food in the refrigerator. She also stated that she did not see any dishes. Ms. Coar also testified that she did not see any personal items or toiletries to establish that an adult male was living there. Ms. Coar stated that she

---

7. We note that although Candidate's attorney attempted during questioning to get Mr. Decker to say that Candidate "resided" at the Boulevard Address, Mr. Decker had trouble saying "reside" and appeared more comfortable saying that Candidate "stayed" at the Boulevard Address.

did not see a man's suit or any type of male clothing until a few days before the hearing on February 28, 2008. Ms. Coar testified that she would enter the Boulevard Address two or three times a week, both during the week and on weekends, for several hours to paint various rooms. Ms. Coar stated that at no point prior to February 22, 2008, did she see Candidate at the Boulevard Address. Generally, when Ms. Coar was finished painting for the day, she would leave her painting materials in the house but would clean up before she left.

Ms. Coar testified that, on February 22, 2008, she and her three children were at the Boulevard Address so that Ms. Coar could remove wallpaper. Ms. Coar testified that Mr. Murphy knocked on the front door and indicated to her that he was looking for Candidate. Ms. Coar told Mr. Murphy that Candidate was not there. Ms. Coar testified that Mr. Decker called her on the phone. Ms. Coar testified that Candidate drove to the side of the house, entered through the back door, and said he came to lie down. Ms. Coar testified that this was the first time that she had ever seen Candidate at the Boulevard Address. Ms. Coar testified that, at this point, she felt anxious and nervous because of the events that were taking place around her with her three children present. Ms. Coar testified that she and her children then left the Boulevard Address due to her discomfort.

Ms. Coar testified that she returned to the Boulevard Address on Sunday, February 24, 2008, to continue painting. Ms. Coar testified that on Monday, February 25, 2008, she noticed adult male clothing at the Boulevard Address for the first time since she had been given access to the Boulevard Address.

Mr. Grande, a realtor for Prudential Realty, was also called as a witness. Mr. Grande testified that he was the listing agent for the Deckers, assisting them in selling the Boulevard Address. He, too, testified that although the Sellers' Property Agreement and Disclosure Statement made no mention of the fact that Candidate ever resided at the Boulevard Address, Mr. Decker verbally told him that Candidate "sometimes stayed there" or that Candidate would be "using" the Boulevard Address at certain times. Mr. Grande stated that he kept a 24 hours' notice on the property, even after the Deckers moved out of the property. Mr. Grande testified that he was at the Boulevard Address once for an open house on November 11, 2007. Mr. Grande testified that he did not see boxes and did not open the refrigerator or closet doors, as it was "not my place." However, Mr. Grande did testify that he entered a bedroom because he heard an alarm clock going off and stated that, upon entering the bedroom to turn off the alarm clock, he noticed bedding on the floor. Mr. Grande testified that the property came off the market on February 26, 2008, because a tenant was moving in.

The final witness to testify was Mr. Murphy, also a candidate for the Democratic nomination for representative in the General Assembly for the 113th Legislative District. Mr. Murphy testified that, on February 22, 2008, he attempted to personally serve Candidate at his office, which was closed, and then at his home at the Varsity Address, but no one answered the door. Mr. Murphy testified that, subsequently, he attempted to serve Candidate at the Boulevard Address. Mr. Murphy testified that he knocked on the front door and that Ms. Coar answered the door. Mr. Murphy asked if Candidate was home, to which Ms. Coar indicated that he was not. Mr. Murphy testified that Ms. Coar seemed nervous that he was looking for

Candidate. Mr. Murphy testified that, at that point, the phone rang, and Ms. Coar excused herself to answer it. Mr. Murphy testified that, about ten minutes later, Candidate arrived at the Boulevard Address by entering through the back door. Mr. Murphy stated that Ms. Coar was startled when Candidate arrived and that she got her three children and left the home. Mr. Murphy explained that he yelled Candidate's name a few times and finally personally served Candidate at the back door.

## II. Findings of Fact and Credibility Determinations

This Court finds, as a matter of fact, that, between December 17, 2007 and February 27, 2008, during which time Candidate circulated his Nomination Petitions, signed his Affidavit and signed his SOFI, Candidate did not stay or otherwise live at the Boulevard Address. We base this finding on the testimony presented to the Court, the exhibits presented, and our review of the applicable law.

We find the testimony of Ms. Coar credible in its entirety, based upon our observation of Ms. Coar's testimony and her demeanor. Ms. Coar testified that she was not required to give notice to anyone before entering the Boulevard Address. She testified that she was allowed to paint rooms in the house. She testified that she did not see any adult male clothing in the house until *after* objections to Candidate's petition were served and approximately three days before the hearing. Ms. Coar testified that although she was in the house for a few hours two or three days a week, both on weekends and weekdays, she never saw Candidate in the house until February 22, 2008. Ms. Coar testified that there was no food, bedding, or personal hygiene items in the Boulevard Address during the period in question. This testi-

mony leads to a conclusion that there was no person staying or otherwise living at the Boulevard Address when Ms. Coar was given access to it by Mr. Decker.

This finding is also supported by inconsistencies in the testimony of Candidate and Mr. Decker. We credit Candidate's testimony that he and Ms. Prutisto purchased a new home at the Varsity Address in November 2007, which they financed through two mortgages totaling $360,640. We credit Candidate's testimony that he did not have a lease with, or pay rent to, the Deckers. We do not credit Candidate's testimony that he paid the utility bills on the Boulevard Address, as no documentary evidence was submitted as proof. Candidate credibly testified that, in mid-December 2007, he suffered two falls which led to two concussions and serious sinus problems. We credit Candidate's testimony that for four to six weeks, from mid-December until the end of January, he was staying at his home at the Varsity Address under the care of Ms. Prutisto. We also credit Candidate's testimony that he was away on a retreat during the last week in January. We do not credit Claimant insofar as he testified that he stayed or slept at the Boulevard Address at any time during the period after he fell and injured himself on or about December 17, 2007 through February 27, 2008. We base these credibility determinations on our observation of Candidate's testimony and his demeanor. Specifically, upon questioning as to his whereabouts at certain times, Candidate seemed evasive or did not answer the questions asked because he could not remember. Although Candidate testified that he brought his sofa, loveseat, kitchen table, television and VHS tapes, he did not testify that he brought a bed with him. Ms. Coar testified to seeing a futon in the house. However, Mr. Grande testified to seeing bedding on the floor in a bedroom. Given Candidate's testimony re-

garding the extent of his injuries after his fall, his injury to his knees, and his sinus problems, we find it unlikely that he would reside without a bed in a home which was being painted. We particularly do not believe that Candidate would choose to stay at the Boulevard Address under these circumstances in light of the fact that his newly purchased home was about one mile away. We believe that if Candidate had resided at the Boulevard Address, there would have been clothes and toiletries there. Further, we do not credit Candidate's testimony that the reason he has now moved to the Varsity Address was because he wanted to protect his family from political attacks. Candidate knew that he would be required to move from the Boulevard Address before the objections were filed because the Boulevard Address had already been leased to Ms. Coar.

We credit Mr. Decker's testimony that, in mid-January 2008, he entered into a lease for the Boulevard Address with Ms. Coar, which was to begin on March 1, 2008. We do not credit Mr. Decker's testimony that Candidate paid the utility bills for the Boulevard Address. We do not credit Mr. Decker's testimony that, after the Boulevard Address was put back up for sale in October 2007, the contract for sale with the listing agent required the listing agent to give 24 hours' notice before showing the home. We do not credit this testimony because such notice is not required by the Listing Contract presented to the Court as Petitioner Murphy Exhibit 5. We credit Mr. Decker's testimony that he gave Ms. Coar access to the Boulevard Address in mid-January, permitted her to begin painting rooms in the house, and allowed her to begin moving her possessions in. We do not credit Mr. Decker insofar as he testified that Candidate stayed at the Boulevard Address at any time after December 17, 2007. We base our determinations regarding Mr. Deck-

er's credibility on our observation of his testimony and his demeanor. Although it was not determinative of our credibility finding, we note that it was necessary for the Court tipstaff to admonish Mr. Decker while he was testifying because he did not treat the proceedings seriously, as evidenced by his inappropriate behavior, including laughing and making facial expressions.

Based on our examination of Mr. Grande's testimony, his demeanor, and the Listing Contract presented to the Court as Petitioner Murphy Exhibit 5, we do not credit his testimony that the Deckers were to receive 24 hours' notice before the Boulevard Address could be shown to potential buyers. We credit the remainder of his testimony. Based upon our evaluation of Mr. Murphy's testimony and his demeanor, and because his testimony was consistent with that of Ms. Coar, we credit Mr. Murphy's testimony in its entirety.

### III.  Discussion

In this case, we must first decide whether Candidate's filings, including his Nomination Petitions, Affidavit, and SOFI, were defective because he listed an incorrect residence. If Candidate's filings are defective, we must then determine whether Candidate can amend his filings to state the correct legal residence.

### A.  Whether the Filings Are Defective

Objectors allege Candidate's Nomination Petitions, Affidavit, and SOFI are defective because they do not list his true residence. Section 1104(b) of the Public Official and Employee Ethics Act (Ethics Act), 65 Pa.C.S. § 1104(b), requires all candidates for state-level office to file a statement of financial interests with the State Ethics Commission (Ethics Commission) on or before the last day for filing nomina-

tion petitions. Section 1104(b)(3) of the Ethics Act requires all candidates to append a statement of financial interests to their nominating petitions. Section 1105(b)(1) of the Ethics Act, 65 Pa.C.S. § 1105(b)(1), requires that a candidate's statement of financial interests contain his address. Section 910 of the Pennsylvania Election Code (Election Code),[8] 25 P.S. § 2870, requires a candidate for office to file, with his nomination petition, an affidavit stating, among other information, his residence.

■ In *In re. Lesker,* 377 Pa. 411, 105 A.2d 376 (1954), the Pennsylvania Supreme Court discussed what constitutes a candidate's residence for the purposes of qualifying as a candidate for public office:

> [i]t seems impossible to restrict the terms habitation, residence and domicile to airtight, waterproof compartments. Their meanings seem bound to escape their lexicographical boundaries and mingle with the others since a person's place of *residence* may be identical with his *domicile,* and *habitation* is always a component part of *residence* and *domicile.* However, in strict technical terminology a *habitation* may be defined as an abode for the moment, *residence* a tarrying place for some specific purpose of business or pleasure, and *domicile* the fixed, permanent, final home to which one always intends to return. A person's civil status is determined by his domicile. Thus, a business man may have his family home in the suburbs of a city where he lives with his wife and children. No matter where he travels nor how long he remains away, he always returns to this abode. This is his domicile. For business reasons he may have a residence in the city, even living there for many months of the year. This residence can never become the

basis for voting or for candidacy for office. If traveling, he may stay at a hotel, boarding or rooming house. This would be his habitation and, regardless of expression of intention, could never become his legal domicile.

*Id.* at 418, 105 A.2d at 380. Likewise, in *In re Nomination Petition of Prendergast,* 543 Pa. 498, 673 A.2d 324 (1996), the Supreme Court stated:

> We have held that the term "inhabitant" or "resident" as stated in Article II, Section 5, "cannot mean one sojourning temporarily, or for some special purpose, but refers to one who has a permanent abode; the domicil [sic] of the senator, representative, governor or judge...."
>
> A domicile is the place at which an individual has fixed his family home and principal establishment for an indefinite period of time. A domicile once acquired is presumed to continue until it is shown to have been changed.... A new domicile can be acquired only by physical presence at a new residence plus intent to make that new residence the principal home.

*Id.* at 505–06, 673 A.2d at 327–28 (internal citations omitted). These definitions are helpful in that they establish that, whether one uses the term residence or domicile, one's residence for purposes of qualifying for office must be a habitation where one has put down roots, not a place where one has hoisted a flag of convenience.

While the foregoing discussion of residence is useful in a general way to give one the flavor of what residence means, it offers little specific aid in actually determining, from the facts of a given case, what constitutes a candidate's residence. Factors that have influenced this Court's

---

8. Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. §§ 2600–3591.

determination of whether a listed address was indeed the candidate's residence include: (1) the candidate's presence or absence at the address, *In re Nomination Petition of Hacker,* 728 A.2d 1033, 1033 (Pa.Cmwlth.1999); (2) where members of the candidate's household reside, *In re Nomination Petitions of McIntyre,* 778 A.2d 746, 753 (Pa.Cmwlth.2001) (Kelley, J. single judge opinion); *Hacker,* 728 A.2d at 1033; (3) whether the candidate pays rent on or has a lease for the property he claims as his residence, *McIntyre,* 778 A.2d at 752; (4) where the candidate sleeps, *id.*; (5) what belongings and personal effects the candidate keeps at the address, *id.*; and (6) whether the candidate owns another home to which he appears more permanently attached, *id.*; *Hacker,* 728 A.2d at 1033.

More recently, in *In re Nomination Petition of Driscoll,* 577 Pa. 501, 847 A.2d 44 (2004), the Supreme Court applied the definition of residence found in Section 704 of the Election Code, 25 P.S. § 2814. Section 704 states that:

[i]n determining the residence of a person desiring to register or vote, the following rules shall be followed so far as they may be applicable:

(a) That place shall be considered the residence of a person in which his habitation is fixed, and to which, whenever he is absent, he has the intention of returning.

25 P.S. § 2814. Although Section 704 does not, by its express terms, apply to a candidate for office, the courts have so applied this definition. *See Driscoll,* 577 Pa. at 512, 847 A.2d at 51; *Prendergast,* 543 Pa. at 506, 673 A.2d at 328.

■ The facts of this case are analogous to those in *Hacker, McIntyre,* and *Driscoll,* in which the courts found the listed address not to be the candidate's legal residence. When we evaluate these factors, we can not conclude that the Boulevard Address was Candidate's true residence. As *Lesker* points out, "residence is a matter of intent," and intent is established by the actual state of the facts. *Lesker,* 377 Pa. at 416, 105 A.2d at 379. Here, the actual facts show that Candidate did not inhabit the Boulevard Address. As in the cases cited above, Candidate did not sign a lease agreement or pay rent to stay at the Boulevard Address. Candidate owned a new home that he had just purchased about one mile away, which was not for sale, and to which he was more permanently attached. In fact, he had moved there just prior to the hearing and, by his own testimony, had always intended to move there. Further, there is no evidence, other than Candidates vague statements that he stayed there, that Candidate slept at the Boulevard Address between December 17, 2007 and February 27, 2008. Candidate admittedly stayed at his Varsity Address home for 4–6 weeks during this period. This Court does not believe that he returned to the Boulevard Address sometime near the end of January, at a time when the property had been rented out and the tenant was given unfettered access to the property. During this time frame, when Candidate testified that the Boulevard Address was his residence, the only possessions of his which Ms. Coar saw were a few pieces of furniture and some VHS tapes. There were no clothes, toiletries, food, dishes, a bed, or any other evidence that a person lived at the Boulevard Address. Importantly, here, unlike in those other cases, there is the credible evidence of Ms. Coar's frequent presence and use of the property which is inconsistent with Candidate's simultaneous residence at the property. At no point did Ms. Coar have to give any type of notice before entering the Boulevard Address, and she was able to paint the premises and

move her own belongings into it. Ms. Coar's use of the home is not consistent with Candidate residing at the home.[9]

Candidate argues that changing his mailing address and notifying his employer of the Boulevard Address is evidence of his residence. The candidates in *Hacker* and *McIntyre* also changed their mailing addresses and voter registration cards; however, as in those cases, merely changing an address did not create a residence for purposes of election law: a post office box or a mail drop does not become a residence. Rather, a person must inhabit the place of residence. We find that Candidate did not inhabit the Boulevard Address. We, therefore, conclude that the Boulevard Address was not Candidate's true residence.

### B.   *Whether Candidate Can Amend*

Since we agree with Objectors that Candidate did not correctly list his legal residence on his Nomination Petitions, SOFI, and Affidavit, we must now determine whether Candidate's Nomination Petitions should be set aside because of this failure. The requirements of a statement of financial interests and affidavit are set out in two different statutes: the Ethics Act, which governs statement of financial interests filings; and the Election Code, which governs the filings of candidate affidavits. With two different statutes, there are two separate lines of case law. We will discuss these two lines of case law separately.

In 1989, the General Assembly amended the Ethics Act to provide that a candidate's failure to file a statement of financial interests in accordance with the provisions of the Ethics Act shall constitute a fatal defect to appear on the ballot. Act of

June 26, 1989, P.L. 26; 65 Pa.C.S. § 1104(b)(3). This amendment began an era of strict adherence to the requirements of the Ethics Act. *See In re Petition of Cioppa*, 533 Pa. 564, 626 A.2d 146 (1993) (finding that untimely filing of the statement of financial interests constituted a fatal error); *In re Nominating Petition of Olshefski*, 692 A.2d 1168 (Pa.Cmwlth.1997) (finding that candidates, who had handed their statement of financial interests to an incumbent borough councilman, and who then filed a statement of financial interests after the statutory deadline were stricken from the ballot, as the statement of financial interests had not been filed with the "governing authority"). The "fatal defect" rule, therefore, stood for the proposition that, absent some effort on the part of the receiving officials themselves to frustrate the process, untimely filing or filing in the wrong place could not be corrected.

Until recently, courts had interpreted Section 1104 of the Ethics Act in a draconian manner, readily disqualifying candidates for defects regardless of whether such defects were made in good faith or bad faith. Courts based this interpretation on Section 1101.1 of the Ethics Act, which states that the Ethics Act "shall be liberally construed to *promote complete financial disclosure* ...." 65 Pa.C.S. § 1101.1(a). Accordingly, nomination petitions were found to be fatally defective on the basis of minor inaccuracies or omissions in their accompanying statement of financial interests, which may have been the result of misunderstandings rather than attempts to deceive the electorate.

The first time that a challenge to the contents of a timely and properly filed

---

9. This Court notes that subsequent to sustaining injuries, Candidate testified that he suffers from severe sinus damage, which will need to be corrected by surgery. Because of Candidate's condition, this Court cannot believe

that Candidate ever had an intention to return to the Boulevard Address where Ms. Coar had been permitted to paint without time or date restrictions.

statement of financial interests arose was in 2003 in the case of *In re Nomination Petition of Anastasio*, 820 A.2d 880 (Pa. Cmwlth.) *aff'd per curiam*, 573 Pa. 512, 827 A.2d 373 (2003). There, this Court set aside the petition, finding the candidate improperly listed "none" in Block No. 10, which requested direct and indirect sources of income. The following year, this Court applied the logic of *Anastasio* to the facts of *In re Nomination Petition of Benninghoff*, 847 A.2d 144 (Pa.Cmwlth. 2004), in which this Court struck the petition because, although the candidate accurately listed his employment as a state representative, like Anastasio, he failed to list this as a source of income in Block No. 10 of the form. The Supreme Court reversed this Court's decision. *In re Nomination Petition of Benninghoff*, 578 Pa. 402, 852 A.2d 1182 (2004). The Supreme Court first transferred the case to the Ethics Commission, with directions for it to determine whether the defect was fatal or amendable. *Id.* at 407, 852 A.2d at 1185. Upon review, the Ethics Commission determined that there was no defect because "governmentally mandated payments" are not required to be disclosed. *Id.* at 407–08, 852 A.2d at 1185. Justice Baer, in an opinion in which Chief Justice Cappy, Justice Newman, and Justice Saylor joined, concluded that "governmentally mandated payments" could not include a state representative's income. *Id.* at 408–10, 852 A.2d at 1185–87. However, the Court concluded that Benninghoff had "substantially complied" with the disclosure requirements by listing his employment as a state representative of the Commonwealth. *Id.* at 411, 852 A.2d at 1187.

In 2005, the Supreme Court, in *In re Nominating Petitions of Braxton*, 583 Pa. 35, 874 A.2d 1143, 1144 (2005) (per curiam), reversed this Court's decision permitting the candidate to amend his statement of financial interests and remain on the ballot where the candidate did not disclose rental income "and the names and addresses of the creditors holding mortgages on his rental properties." The Supreme Court found this Court's decision to be contrary to its decision in *Benninghoff*. *Id.*

In 2006, the issue was raised again when Albert Littlepage, a candidate for Municipal Court in Philadelphia, timely filed a statement of financial interests, but failed to indicate any income derived from rental properties in Block No. 10 of the form. *In re Nomination Petition of Littlepage*, 589 Pa. 455, 909 A.2d 1235 (2006). The trial court concluded that, under *Benninghoff*, the statement of financial interests "substantially complied" and dismissed the objections. *Id.* at 459, 909 A.2d at 1237,. This Court, in a single-judge opinion, reversed concluding that the facts more closely resembled those in *Anastasio*, rather than *Benninghoff*. *Id.* at 459–61, 909 A.2d at 1237–38. The Supreme Court affirmed in an opinion by Justice Baer, in which Chief Justice Cappy, Justice Castille, Justice Newman, and Justice Saylor joined. *Id.* at 461–64, 909 A.2d at 1238–41. The Court reaffirmed the vitality of *Anastasio*, as modified by *Benninghoff*. *Id.* at 463, 909 A.2d at 1240.

In the same year, this Court, relying on *Anastasio*, set aside the nomination petition of Timothy Carroll, a candidate for a seat in the General Assembly. This Court set aside his nomination petition because his statement of financial interests was deficient in two ways: (1) Carroll failed to list as a public position his unpaid position as a member of a municipal authority; and (2) Carroll failed to indicate that he was a director in a not-for-profit organization. The Supreme Court reversed our decision, in which we had compared the facts to *Anastasio*. *In re Carroll*, 586 Pa. 624, 896 A.2d 566 (2006). Justice Castille, in an

opinion in which Chief Justice Cappy, Justice Newman, Justice Saylor, and Justice Eakin joined, concluded that the principal purpose of the statement of financial interests was to disclose finances. *Id.* at 638–39, 896 A.2d at 574. The Court concluded that because neither position was a paid position, the General Assembly did not intend the disproportionate consequence of denying a candidate the right to run for public office for merely failing to disclose a public position which does not implicate financial interests. *Id.* at 640–42, 896 A.2d at 575–77.

The tension between *Anastasio* and *Benninghoff* continued until the Supreme Court's recent decision *In re Nomination of Paulmier*, 594 Pa. 433, 937 A.2d 364 (2007), in which it specifically overruled its per curiam order in *Anastasio*, as well as *Anastasio's* progeny, such as *Littlepage* and *In re Braxton. Paulmier*, 594 Pa. at ——, 937 A.2d at 371. Thus, if the issue presented in the case at bar had been submitted to this Court three months ago, we clearly would have been constrained to sustain the objections to the nomination petitions and order Candidate's name to be removed from the ballot merely because there was a defect on his statement of financial interests. However, *Paulmier* has substantially changed the way courts are to construe defects on the statement of financial interests, and now defects are amendable as long as they were not the result of bad faith.

In *Paulmier*, the candidate's petitions were challenged solely on the basis of his statement of financial interests because, in Block No. 10 of the form, the candidate listed "rental income" without specifying the source. *Id.* at ——, 937 A.2d at 367. Specifically, the objection was grounded in the candidate's failure to disclose the addresses of several rental properties and the names of tenants who had paid $1,300

or more in rent during the previous year, even though the form did disclose that the candidate's occupation was "housing specialist" and listed "rental income" as a source of income. *Id.* The trial court, sitting as a three-judge panel, granted the petition to set aside. In a single-judge opinion, this Court affirmed the trial court, noting the "fatal defect" rule in *Anastasio. Paulmier*, 594 Pa. at ——, 937 A.2d at 367.

On appeal, the Supreme Court reversed this Court's order and vacated the trial court's order. *See Id.* at ——, 937 A.2d at 373. Chief Justice Cappy, in an opinion in which Justice Eakin, Justice Baldwin, Justice Fitzgerald, Justice Baer, and Justice Castille joined, acknowledged the existence of "two competing cases" interpreting the "fatal defect" rule: *Anastasio*, which required strict compliance with the Ethics Act; and *Benninghoff*, which allowed amendments to a statement of financial interests under certain circumstances. *Id.* at ——, 937 A.2d at 369. The Supreme Court noted that the two statutory schemes, the Election Code and the Ethics Act are to be read *in pari materia. Id.* at ——, 937 A.2d at 369. "The Ethics Act states that failure to file [a statement of financial interests] in accordance with the provisions of the Act is a fatal defect for a petition to appear on the ballot." *Id.* While the Ethics Act seeks to promote full financial disclosure, the Election Code requires a more liberal construction in order to protect a candidate's right to run for public office. *Id.* The Court found the "divergence" between the *Anastasio* per se rule and the *Benninghoff* substantial compliance rule to be "irreconcilable" when looked at separately under either the Ethics Act or the Election Code. However, the Court went on to state that:

> When the language of the Ethics Act is tempered by the language of the Election Code, it is clear that the intent of

the Legislature is to encourage **both** full financial disclosure and protect voter choice. Read together, the Legislative intent is clearly best served by a rule that allows a timely filer to amend in order to come into full compliance giving the public both the benefit of full financial disclosure and the broadest choice of representatives.

*Paulmier*, 594 Pa. at 445, 937 A.2d at 371. Accordingly, the Court held that the "fatal defect" rule was only intended to bar those candidates from appearing on the ballot who failed to file a statement of financial interests, or who filed a statement of financial interests in an untimely manner. *Id.* Any other defect as to substance, even if the defect is apparent on the face of the form, may be amended so long as the amendment is done in a "timely manner." *Id.* "In other words, all defects related to the content of disclosures on a timely filed statement of financial interest[s] are subject to timely amendment." *Id.* Furthermore, the Court found it "important" to note that the Ethics Act requires a statement of financial interests to "be provided to the best of the knowledge, information and belief of the person required to file. This means that candidates must still file *in good faith,* even though they do have an opportunity to amend. *See* 65 Pa.C.S. § 1105(a). *See also* 65 Pa.C.S. § 1107(5)." *Id.* at 445 n. 3, 937 A.2d at 371 n. 3 (emphasis added).

Justice Castille, Justice Saylor, and Justice Baer filed concurring opinions. Specifically, Justice Baer joined the majority's holding in full, but wrote separately to address why he has taken a somewhat contrary position in prior cases, but now agrees with the conclusions set forth by the majority. *Id.* at 450, 937 A.2d at 374 (Baer, J., concurring). Justice Baer states that "as the author of *Littlepage* and *Benninghoff,* I attempted to draw fine distinctions between the different defects con-

tained in the various financial interest statements because I believed the need for full disclosure" pursuant to the Ethics Act "was paramount." *Id.* at 451, 937 A.2d at 375. However, he now agreed that the goals of the Election Code are equally important and that "[s]trict interpretation of the fatality rule has resulted in the child's game of 'gotcha' through far too many challenges based upon technical omissions, without regard to whether they were made through oversight, misunderstanding of the instructions or simple inadvertence, as opposed to bad faith." *Id.* Thus, Justice Baer explained his view that:

> good faith remains a prerequisite to any amendment. As the Majority points out, Section 1105(a) of the Ethics Act, 65 Pa.C.S. § 1105(a), maintains the requirement that the information contained on a statement of financial interest[s] be provided to the best of the knowledge, information and belief of the person required to file, thereby preserving this standard. Thus, I emphasize that, in my view, omissions found by a court of original jurisdiction to be intentional and, thus, in bad faith, would not be subject to amendment and would, therefore, lead to the removal of a candidate from the ballot. I believe the Majority's decision is fully in agreement with this proposition.

*Id.* at 453, 937 A.2d at 375–76.

Thus, after our Supreme Court's decision in *Paulmier,* courts must allow amendments to timely filed statements of financial interests for all defects related to the content of disclosures as long as the candidate "provide[s the information on the statement of financial interests] to the best of [his] knowledge, information and belief," and it was *not executed in bad faith. Id.* at 445 n. 3, 937 A.2d at 371 n. 3 (majority opinion). Thus, after *Paulmier,*

to grant a petition to set aside a nomination petition based on a defective statement of financial interests, the Court needs to evaluate the candidate's intent.

In addition to filing a statement of financial interests, Section 910 of the Election Code also requires a candidate to file an affidavit, stating, among other things: "(a) his residence, with street and number, if any, and his post-office address...." 25 P.S. § 2870(a).

■ The provisions of the Election Code must be liberally construed so as not to deprive an individual of his right to run for office or the voters of their right to elect the candidate of their choice. *In re Creighton*, 899 A.2d 1166, 1168 (Pa. Cmwlth.), *aff'd per curiam*, 586 Pa. 652, 896 A.2d 583 (2006). However, "the provisions of the [E]lection [Code] relating to the form of nominating petitions and the accompanying affidavits are not mere technicalities but are necessary measures to prevent fraud and to preserve the integrity of the election process." *In re Nomination Petition of Cianfrani*, 467 Pa. 491, 494, 359 A.2d 383, 384 (1976). The Election Code's "requirements of sworn affidavits are to insure the legitimacy of information crucial to [this] process." *Id.* Thus, the policy to liberally construe the language of this statute cannot be distorted to emasculate those requirements necessary to assure the integrity of the election process. *Id.* Before an affidavit may be declared void and invalid because it contains false information, there must be evidence that the candidate knowingly falsified the affidavit with the intent to deceive the electorate. *Driscoll*, 577 Pa. at 511, 847 A.2d at 52; *McIntyre*, 778 A.2d at 754; *Hacker*, 728 A.2d at 1035.

In *Hacker*, a candidate for sheriff of Berks County indicated on his nomination petition and affidavit that he resided in Kutztown, Pennsylvania. 728 A.2d at

1033. Objections were filed alleging that the candidate falsified his nomination petition and affidavit because he was actually residing in Fleetwood, Pennsylvania. *Id.* This Court determined that, although the candidate may not have resided at the Kutztown address, he believed that the Kutztown address was his residence because he recently purchased the home, was renovating it in preparation of moving in, his other home was put up for sale, and he changed his address on his driver's license and voter registration card to reflect his new address. He, therefore, did not intend to deceive the electorate by listing the Kutztown address on his nomination petition and affidavit. *Id.* at 1035. Thus, this Court declined to set aside the candidate's nomination petition. *Id.*

In *McIntyre*, a candidate for common pleas judge for Allegheny County indicated on his nomination petition that he resided in Upper St. Clair, Pennsylvania, but indicated on his affidavit that he resided in Pittsburgh, Pennsylvania. 778 A.2d at 750 n. 5. Objections were filed alleging that the candidate had falsified his affidavit by listing an incorrect residence. *Id.* This Court found that the candidate resided at the Upper St. Clair address and that his affidavit was, therefore, false. *Id.* at 753. Moreover, this Court determined that we could not find that the candidate believed the Pittsburgh address to be his residence. *Id.* at 754. This Court further determined that the candidate intended to deceive the electorate by indicating an incorrect address on his affidavit, as evidenced by the disparity on the filings and the candidate's inability to dispel that disparity through his testimony. *Id.* Therefore, this Court set aside the candidate's nomination petition. *Id.*

In *Driscoll*, a candidate for the Democratic Party nomination for representative of the 15th Congressional District indicat-

ed on his nomination petition and his affidavit that he resided in Allentown, Pennsylvania. 577 Pa. at 503–04, 847 A.2d at 45–46. Objections were filed alleging that the candidate actually resided in Haverford, Pennsylvania and, thus, had misrepresented his residence in his nomination petition and his affidavit. *Id.* at 504–05, 847 A.2d at 46. In response, the candidate motioned for permission to amend his nomination petition and affidavit to change the residence listed on those documents from Allentown to Haverford. *Id.* at 505, 847 A.2d at 47. A hearing was held at which the candidate explained why he had listed Allentown as his residence on his nomination petition and affidavit, and admitted that he had made a mistake in that regard. *Id.* at 505, 847 A.2d at 47. This Court determined that the candidate did not intend to deceive the electorate, as evidenced by his admission of his mistake at the hearing and his public acknowledgement that he resided in Haverford. *Id.* at 507, 874 A.2d at 48. Therefore, this Court allowed the candidate to amend his filings and remain on the ballot. *Id.* at 507, 874 A.2d at 48. The Supreme Court affirmed this Court's determination. *Id.* at 515–16, 847 A.2d at 53–54. In doing so, the Court stated:

> We ... find that the facts were sufficient to support the Commonwealth Court's finding that Candidate, unlike McIntyre or the candidate in *Cianfrani,* *did not intentionally falsify his affidavit* to deceive the electorate. *See Com. State Ethics Com'n v. Baldwin,* [498 Pa. 255,] 445 A.2d [1208] at 1211 (an affidavit is false only where "the misstatement was knowingly contrived"); *see also,* 25 P.S. § 3502.1 (*candidate must "knowingly" falsify affidavit* to be liable for such a charge under statute); *Commonwealth v. Brown,* 149 Pa.Super. 130, 28 A.2d 259 (1942) (same), *aff'd on other grounds, Commonwealth v. Brown,* 346

Pa. 192, 29 A.2d 793 (1943). Rather, the evidence indicates that Candidate listed his Allentown address as his residence and Lehigh County as his election district because *he believed that his residence and election district had changed to those places once he rented a home in* Allentown and registered to vote in Lehigh County based on that address. This is apparent from the evidence that Candidate freely acknowledged during the newspaper interview conducted while his petition was being circulated that he was from Haverford, that his wife and children live in Haverford, and that he only recently rented a townhouse in Allentown. Moreover, *unlike McIntyre, Candidate candidly admits that he stated the improper legal residence on his petition and affidavit* and thus the residence stated on his petition and affidavit now needs to be changed. Therefore, because Candidate's Haverford address does not disqualify him from running for the office of Representative and because the evidence supports the Commonwealth Court's finding that *Candidate did not intentionally falsify his affidavit so as to deceive the public,* we hold that the Commonwealth Court did not abuse its discretion in finding that Candidate's incorrect listing of his residence and election district was an amendable defect.

*Id.* at 515–16, 847 A.2d at 53 (footnote omitted) (emphasis added).

■ This Court notes that under the most recent cases, in reviewing the SOFI under the Ethics Act and the Affidavit under the Election Code, the standard is the same in that the Court must evaluate a candidate's intent. Although *Paulmier,* in applying the Ethics Act, did not specifically speak to the consequences where a candidate's bad faith is found, case law applying the Election Code has. We, therefore,

must determine whether Candidate intentionally listed the wrong address in bad faith in order to deceive the electorate. In doing so, this Court recognizes the goals of the Election Code to protect a candidate's right to run for public office and the public's right to be given elective choices. *Paulmier*, 594 Pa. at 445, 937 A.2d at 371 n. 3. We also recognize the goals of the Ethics Act and the Supreme Court's pronouncement that bad faith will not be tolerated. *Id.* at 445 n. 3, 937 A.2d at 371 n. 3. Based on the facts of this case, the credible evidence presented at the hearing, and our extensive review of the statutes and applicable case law, we are constrained to find in favor of Objectors and to set aside Candidate's Nomination Petitions.

These cases are very fact-specific, and this Court has engaged in comparing and contrasting the facts in the case at bar with previous cases in order to make its determination. We find that the present case is analogous to *McIntyre* and distinguishable from *Hacker* and *Driscoll*. Like in *McIntyre*, and unlike in *Hacker*, we are unable to find that Candidate believed that he was residing at the Boulevard Address. There were no credible facts that could support an honest belief that the Boulevard Address was Candidate's residence.[10] Candidate did not bring his possessions to the Boulevard Address, but instead moved almost all of them to the Varsity Address. There was no clothing. There were no toiletries. There were no personal belongings other than some pieces of furniture and a few VHS tapes. There was no food or dishes. Tellingly, it was not until after the objections were filed, and less than a week before Candidate was admittedly

moving out of the Boulevard Address, that his possessions suddenly appeared at the Boulevard Address. In addition, Ms. Coar did not see Candidate at the Boulevard Address, or evidence of his presence there, until the day he came there to be served. At that time, he walked in through the back door and said he was there to lie down. We find it incredible that he suddenly showed up, ready to lie down, when Ms. Coar, her three children and dog were at the property removing wallpaper, and Mr. Murphy was there to serve him with the objections.

Our review of the evidence establishes that Candidate knew, after December 17, 2007, that he was not staying at the Boulevard Address, and so did his family. Mr. Decker knew that Candidate was not residing there. It is incredible that Mr. Decker believed his father-in-law was actually residing at the Boulevard Address, yet would give a stranger unrestricted access, to come and go, to paint and remove wallpaper, to bring over her possessions, and to bring her children and dog to the home whenever, and for however long, she wished. If Mr. Decker truly thought that his father-in-law was residing at the Boulevard Address, he would not have done this. Candidate also knew that he was not staying at the Boulevard Address, which is evidenced by having few personal possessions there. He moved most of his possessions to the Varsity Address when he moved out of the Applewood Address. We find it incredible that Candidate, given his testimony about his injuries to his knee, head and his sinus problems, would reside in a house without his belongings, without a real bed, and where there was on-going

---

**10.** Despite the complexity of our discussion of what constitutes a residence for purposes of election law, we believe that the average layperson, whose understanding is not hampered by the nuances of statute and precedent, does have a general comprehension of what the term "residence" connotes. At the very least, we believe this understanding includes habitation, and an element of permanence and attachment.

painting, when his new home, which he owned with his fiancée, where his belongings were, was approximately one mile away.[11] Even more telling were Candidate's actions of bringing in his personal possessions, such as clothing, just two days after he was served with the objections and three days before the hearing. Unlike the candidate in *Driscoll*, who was truthful about his actions, Candidate did not explain to the Court why he moved his clothing in a few days before Ms. Coar took up residence at the Boulevard Address and at no point admitted to the Court that he had not been staying there. Instead, he tried to perpetuate the misrepresentation even to the Court.[12]

Looking at the credible evidence as a whole, this Court finds that Candidate's representation, that his residence from at least December 17, 2007 until February 27, 2008 was the Boulevard Address, was not an honest mistake, or an unintentional one, but one made with care and thought. In sum, it was a purposeful misrepresentation made in bad faith with the intent to deceive the electorate. Therefore, Candidate may not amend his filings.[13]

### III. Conclusion

Accordingly, Candidate's Nomination Petitions shall be set aside, and Candidate's name shall not appear on the ballot.[14]

Furthermore, this Court orders costs, including the fees for the court reporter, to be divided equally among Pilcheskys, Mr. Murphy and Candidate.

11. This Court believes that Candidate intended this deception. As noted earlier in this opinion, the Pilcheskys contend that Candidate sought to keep the electorate from knowing that he had moved in with his fiancée out of concern that members of the electorate would look unfavorably on such a move, and therefore not support him at the polls. After hearing the testimony and reviewing the evidence, the Pilcheskys' contention seems very plausible and, indeed, significantly more likely than not. It is not this Court's function to evaluate or comment on the personal choices Candidate made in regard to his living situation other than as to how they relate to his compliance with the Election Code and Ethics Act. Whatever the exact reasons for his actions, this Court has no doubt that Candidate's choices were designed to specifically keep the electorate from knowing his true residence.

12. Had Candidate testified that he made an honest mistake as to his residence, we would be inclined to find such a defect amendable as the Court did in *Driscoll*. However, Claimant did not so testify even though he testified after hearing the testimony of Ms. Coar. Candidate, throughout his testimony, stood by his incredible story that after he could care for himself at the end of January 2008, and in light of the fact that Ms. Coar signed the lease agreement on January 22, 2008, and was using the premises, he returned to reside at the Boulevard

Address for the month during which his Affidavit, SOFI, and Nomination Petitions were due.

13. Even if, under *Paulmier*, bad faith on the part of a candidate would not prohibit amendment, the result here would be the same. Because Candidate intentionally falsified his Nomination Petitions and, more importantly, his Affidavit, pursuant to *Driscoll*, *McIntyre*, and *Hacker*, he may not amend those filings.

14. Because we find a fatal defect in Candidate's nomination petitions, SOFI and Affidavit, we need not reach the issues of whether Candidate's SOFI can be further amended to reflect his occupations and self-employment. However, were we to address these issues, we note that we credit Candidate's testimony that he did not believe his insurance license was active in 2007 and that he is employed by the Trinity Congregational Church as a pastor on a part-time basis. Based on these credibility findings, we would conclude that Candidate could amend his occupation to reflect that of pastor, but that he need not indicate insurance agent as a profession since he credibly testified that he did not utilize his insurance license in 2007. There was no evidence that Candidate was self-employed.

## *O R D E R*

**NOW,** March 14, 2008, it is hereby ordered as follows:

1. Petition to Set Aside the Nomination Petitions of Frank A. Shimkus for the Office of State Representative for the 113th District of the Commonwealth of Pennsylvania is **granted.**

2. The Secretary of the Commonwealth shall not certify the name of Frank Andrews Shimkus [1] to the proper officials for inclusion on the ballot of the Democratic Party Primary to be held on April 22, 2008.

3. The Chief Clerk shall send a certified copy of this order to the Secretary of the Commonwealth of Pennsylvania.

4. One-third of the court reporter fees of the court reporter for 112 M.D. 2008 and 142 M.D. 2008 should be paid by Petitioners Joseph and Joanne Pilchesky. One-third of the court reporter fees of the court reporter for 112 M.D. 2008 and 142 M.D. 2008 should be paid by Kevin Murphy, Petitioner in 142 M.D. 2008.[2] One third of the court reporter fees of the court reporter for 112 M.D. 2008 and 142 M.D. 2008 should be paid by Candidate Frank Andrews Shimkus.

## *O R D E R*

**NOW,** March 14, 2008, it is hereby ordered as follows:

1. Petition of Kevin Murphy to Set Aside the Nomination Petition of Frank Andrew Shimkus as a Candidate for the Democratic Nomination in the General Assembly from the 113th District is **granted.**

2. The Secretary of the Commonwealth shall not certify the name of Frank Andrews Shimkus [1] to the proper officials for inclusion on the ballot of the Democratic Party Primary to be held on April 22, 2008.

3. The Chief Clerk shall send a certified copy of this order to the Secretary of the Commonwealth of Pennsylvania.

4. One-third of the court reporter fees of the court reporter for 142 M.D. 2008 and 112 M.D. 2008 should be paid by Petitioner Kevin Murphy. One-third of the court reporter fees of the court reporter for 142 M.D. 2008 and 112 M.D. 2008 should be paid by Joseph and Joanne Pilchesky, Petitioners in 112 M.D. 2008.[2] One third of the court reporter fees of the court reporter for 142 M.D. 2008 and 112 M.D. 2008 should be paid by Candidate Frank Andrews Shimkus.

---

1. We note that although the caption refers to Candidate as Frank Shimkus, and the Petition to Set Aside refers to Candidate as Frank A. Shimkus, Candidate's Affidavit reflects the name Frank Andrews Shimkus.

2. The above-captioned matter was consolidated for purposes of hearing with the objections filed by Kevin Murphy to the nomination petitions of Frank Andrews Shimkus at docket number 142 M.D. 2008.

1. We note that although the caption refers to Candidate as Frank Andrew Shimkus, and the Petition to Set Aside refers to Candidate as Frank Andrew Shimkus, Candidate's Affidavit reflects the name Frank Andrews Shimkus.

2. The above-captioned matter was consolidated for purposes of hearing with the objections filed by Joseph and Joanne Pilchesky to the nomination petitions of Frank Andrews Shimkus at docket number 112 M.D. 2008.