IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: The Nomination Petitions of : 
Daniel B. Smith, Jr. as a Democratic : 
Candidate for State Representative : 
in the 12th Legislative District : No. 138 M.D. 2018
 : 
Petition of: Rizwan Mahmood and : Heard: March 22, 2018
Kevin R. Costello :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge


OPINION BY
JUDGE McCULLOUGH                              FILED:  March 29, 2018


Before the Court is the Petition to Set Aside the Nomination Petition of Daniel B. Smith, Jr. (Candidate) as a Democratic Candidate for the Office of Representative in the General Assembly in the 12th Legislative District in the Primary Election to be held on May 15, 2018.  On March 12, 2018, Rizwan Mahmood and Kevin R. Costello (Objectors) filed the Petition to Set Aside in this Court.

Pursuant to section 912.1(14) of the Pennsylvania Election Code (Election Code),[1] a candidate for the Office of Representative in the General Assembly must present at least 300 valid signatures of registered and enrolled electors of the political party of the candidate.  25 P.S. §2872.1(14).  In their Petition to Set Aside, Objectors seek to invalidate a number of the 338 signatures contained in Candidate's nomination petition.  Specifically, Objectors challenged a total of 46 signatures, which include 32

_____

[1] Act of June 3, 1937, P.L. 1333, added by the Act of December 12, 1984, P.L. 968, *as amended*.

individual signatures and a global challenge with respect to pages 4 and 7 of the Nomination Petition, concerning 14 signatures. The global challenge alleged that the circulator of those pages was a registered voter of the Republican party and could, therefore, not obtain signatures for a Democratic nominee.

On March 14, 2018, this Court entered a Scheduling and Case Management Order scheduling a hearing on the Petition to Set Aside for March 22, 2018, at 1:00 p.m., and imposing certain duties and obligations upon Objectors and Candidate. Therein: (1) Objectors were ordered to secure the services of a court stenographer for the hearing and, if signatures were challenged, to secure the presence of a SURE system[2] operator (Operator) for the hearing; (2) Objectors were ordered to personally serve Candidate or an adult member of Candidate's family, on or before 5:00 p.m. on March 19, 2018, with a copy of the order, the Petition to Set Aside, and one digital media device containing the objections and to file proof of service in this Court; (3) Objectors and Candidate were ordered to file a list of all witnesses intended to testify at the hearing; (4) Objectors were ordered to immediately arrange to meet with Candidate or his representative and a SURE system operator, if necessary, to review before the hearing each and every challenged signature; (5) Objectors and Candidate were ordered to file a stipulation of the parties identifying the total number of completed signatures submitted; the total number of uncontested signatures submitted; the total number of signatures challenged; each and every signatures challenged, identified by page number and line number, and the basis for the objection; and each and every signature to be stricken as invalid or for which an objection is to be

---

[2] As this Court has previously noted, "[t]he SURE system is the Statewide Uniform Registry of Electors, the statewide database of voter registration maintained by the Department of State and administered by each county." *In re Nomination Petition of Morrison-Wesley*, 946 A.2d 789, 792-93 n.4 (Pa. Cmwlth.), *aff'd*, 944 A.2d 78 (Pa. 2008).

withdrawn, identified by page number and line number, if the parties reach such a stipulation; (6) Candidate was ordered to file a list of all signatures, identified by page number and line number, that were facially defective and that he intended to rehabilitate, also stating the manner in which he intended to rehabilitate them; and (7) Objectors and Candidate were ordered to file all of the foregoing items with this Court no later than 12:00 noon on March 21, 2018. The Scheduling and Case Management Order also stated that a party's failure to comply with any provision of the order may preclude the noncompliant party from presenting evidence and could result in the imposition of monetary sanctions.

As of the March 21, 2018 deadline, there were 14 signature lines subject to a global challenge, and 32 individual signature line challenges. While neither party technically complied with this Court's March 14, 2018 Scheduling and Case Management Order, both Objectors and Candidate filed pre-trial statements on March 21, 2018. These pre-trial statements revealed that the parties had agreed that 20 of the 32 individual signature line challenges were invalid and should be stricken, leaving only 12 signatures in dispute in that category. Candidate advised that he would present affidavits and/or live witness testimony to rehabilitate these signatures, while Objectors would rely on the SURE system operator to support their challenges. Both parties agreed that the global challenge (involving 14 signatures) represented a legal issue that would need to be decided by the Court.

On March 22, 2018, the Court conducted a hearing on Objector's Petition to Set Aside. Because the parties had not filed a stipulation prior to the hearing, the

parties read into the record the 20 signature lines that they stipulated were invalid.[3] This left candidate with 318 signatures, 26 of which were in dispute.[4] During the course of the hearing, the Court considered the 12 remaining challenges to individual signature lines[5] and heard oral argument regarding the global challenge to 14 signatures.

Global Challenge

We first address the issue of whether Section 909(a) of the Election Code, 25 P.S. §2869(a), violates the First Amendment of the United States Constitution.[6]

Section 909(a) of the Election Code states that the circulator's affidavit must indicate that the circulator is "registered as a member of the designated party of the" candidate. 25 P.S. §2869(a). Objectors argue that 14 signatures should be stricken, specifically the 8 signatures that appear on page 4 and the 6 signatures on page 7, because the circulator was a registered Republican circulating a nomination petition for the Democratic candidate. In *De La Fuente v. Cortes*, 261 F. Supp. 3d 543 (M.D. Pa. 2017), a federal district court concluded that, to the extent the circulator is registered with a party that is not the same as that of the candidate, the restriction

---

[3] Page 1, lines 20, 24, 26, 27, 30; page 2, line 11; page 3, lines 1, 11; page 6, line 22; page 10, line 12; page 11, line 14; page 12, lines 23, 28; page 13, lines 8, 20; page 14, line 10; page 15, line 11; page 16, lines 2, 23; and page 17, line 22.

[4] Of the remaining 26 signatures in dispute, 12 signatures were subject to individual challenges, and 14 signatures were subject to a global challenge.

[5] Page 3, line 17; page 5, line 1; page 9, lines 1, 2, 3; page 12, line 16; page 13, line 9; page 16, line 11; page 17, lines 12, 19; and page 18, lines 2, 5.

[6] U.S. CONST. amend. 1.

4

imposed by section 909(a) did not contravene the rights of free speech and association under the First Amendment of the United States Constitution.

In response, Candidate relies on the decision rendered by the federal district court in *Morrill v. Weaver*, 224 F. Supp. 2d 882 (E.D. Pa. 2002), as endorsed by our Supreme Court in *In re Stevenson*, 40 A.3d 1212 (Pa. 2012), along with our decision in *In re Gordon*, 143 A.3d 612 (Pa. Cmwlth.), *aff'd per curiam*, 134 A.3d 1043 (Pa. 2016). He contends that these cases compel the conclusion that section 909(a) violates the First Amendment.

By their very nature, all election laws impose at least some burden on the expressive and associational rights protected by the First Amendment. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). To determine whether a particular burden violates the Constitution, and level of scrutiny to be applied, a court "must weigh the character and magnitude of the asserted injury to the rights protected" by the First Amendment against "the precise interests put forward by the State as justifications for the burden." *Id.* at 434. When an election law imposes a "severe" burden on First Amendment rights, it is subject to strict scrutiny and must be "narrowly drawn to advance a state interest of compelling importance." *Id.* If the law inflicts only a "reasonable, nondiscriminatory" burden, "the State's important regulatory interests are generally sufficient to justify" the restriction. *Id.* In cases where there is no burden, or the burden is only trivial, the State need only prove that a legitimate interest is advanced by the law and that the law bears a rational relationship to that interest. *Republican Party of Pennsylvania v. Cortes*, 218 F. Supp. 3d 396, 408 (E.D. Pa. 2016) (collecting cases); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 362-63 (1997).

As a starting point, both parties focus their discussion on *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), and contest

5

whether the holding in that case can be extended to invalidate the party-line requirement in section 909(a).

In *Buckley*, the United States Supreme Court analyzed a Colorado statue that required the circulators of "initiative-petitions" to be registered voters. Pursuant to Colorado's constitution, citizens are vested with the authority to make a law directly through an initiative that is placed on an election ballot,[7] and proponents of the initiative circulate petitions collecting signatures with the goal of obtaining enough signatures that the initiative makes it onto the ballot. The Court held that this type of petition circulation constitutes "core political speech" because it involves "interactive communication concerning political change." 525 U.S. 186-87. Applying what appears to be a form of strict scrutiny, the Court in *Buckley* struck down the registration requirement, reasoning that the statute "drastically reduces the number of persons" that are "available to circulate petitions," *id.* at 193, and does so "without impelling cause," *id.* at 197.

In *Morrill*, Green Party candidates and activists filed suit in a Pennsylvania federal district court requesting a preliminary injunction restraining enforcement of two requirements in section 251(d) of the Election Code, 25 P.S. §2911(d). This section states, in pertinent part, that circulators must be "qualified electors of the electoral district" in which the candidate is running, *id.*, and the Green

---

[7] By way of background, "in U.S. politics, the terms initiative and referendum refer to processes that allow citizens of many states to vote directly on particular pieces of legislation. An initiative process allows citizens to propose or initiate a statute or constitutional amendment. Citizens initiating such legislation are known as the measure's proponents. The referendum process allows citizens to refer a statute passed by the legislature to the ballot so that voters can enact or repeal the measure. Once enough signatures are gathered on petitions, the law is usually stayed, or stopped from going into effect, until the voters have decided the question." *Initiative and Referandum*, BALLOTPEDIA, https://ballotpedia.org/Initiative_and_referendum (last visited March 28, 2018).

Party plaintiffs contended that the registration requirement ("qualified elector") and the in-district requirement ("of the electoral district") violated the First Amendment. The federal district court agreed, concluding that both conditions "unconstitutionally restrain the freedom of political expression and association of the plaintiff candidates and activists." *Morrill*, 224 F. Supp. 2d at 885.

At the outset, the court in *Morrill* noted that under the Pennsylvania Election Code,[8] the Green Party is considered a minor political party and does not hold primary elections like the Democrat and Republican parties. Instead, the only way a Green Party candidate can secure a spot on the ballot is when the candidate obtains the requisite number of signatures on nomination papers, which is statutorily designated as an amount equivalent to two percent of the largest number of votes cast for any elected candidate or official in the previous election.

With respect to the registration requirement, the court applied *Buckley* and determined that "the statute's registration requirement limits the number of voices who will convey the Green Party message and cuts down the size of the audience its proponents can reach," *id.* at 898, having the effect of eliminating almost 4 million Pennsylvania citizens who are un-registered to vote. From this observation, the court concluded that requiring circulators to "be registered voters would impose a severe burden on Plaintiffs' and other Pennsylvania citizens' constitutional freedoms," and found that "the Commonwealth has presented no compelling or sufficient reason to justify the burdensome registration requirement." *Id.* at 900. In order to give the phrase "qualified electors" a constitutional construction, the *Morrill* court interpreted it to mean that a circulator does not need to be a registered voter. The court determined that if it rendered a contrary interpretation, "then strict scrutiny of the statute reveals that it

___

[8] Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. §§ 2600-3591.

7

is not narrowly-tailored to meet a compelling government interest, it unconstitutionally burdens core First Amendment rights of freedom of expression and association, and it must be struck down." *Id.*

Reviewing the in-residency requirement, the court in *Morrill* turned to the decisions of other federal courts that have addressed the constitutionality of state statutes imposing residency requirements on petition circulators and petition affiants. Relying most predominately on the Second Circuit's decision in *Lerman v. Board of Elections in the City of New York*, 232 F.3d 135 (2d Cir. 2000), the court concluded: "Green Party candidates and activists from around Pennsylvania have their freedoms of political expression and association sharply curtailed, because they are prohibited from being affiants to nominating petitions for many candidates they support who happen to be running outside the districts in which they reside." *Morrill*, 224 F. Supp. 2d at 901-02. The court then surveyed and assessed the Commonwealth's stated justifications for the statute and determined that the in-district residency requirement "severely burdens [p]laintiffs' and others' protected First Amendment rights of free political expression and association" and "the Commonwealth has articulated no significant interest . . . which could not be served by any number of much less-restrictive policies." *Morrill*, 224 F. Supp. 2d at 885. Because the in-residency requirement "is not narrowly-tailored to serve a compelling State interest," the court declared that it was invalid under the First Amendment. *Id.* Accordingly, the court in *Morrill* entered a permanent injunction prohibiting the Commonwealth from enforcing the registration and in-district requirements of section 251(d).

In *In re Stevenson*, a case in which an independent candidate for the Office of State Representative filed nomination papers, this Court struck the signatures that were obtained by a circulator who did not reside in the same district as the candidate.

8

On appeal, our Supreme Court reversed. Although recognizing that the courts of this Commonwealth are not bound to follow the decisions of federal appellate and district courts, our Supreme Court concluded that the judgment and permanent injunction issued by the court in *Morrill* against the Commonwealth was entitled to preclusive effect and, for all practical purposes, constitutes binding authority. In a footnote, the *Stevenson* Court emphasized that its decision rested solely on principles of full faith and credit, respecting the final and conclusive judgment of a federal court, and expressly stated that it was not offering an "opinion on the merits of the *Morrill* court's analysis of the First Amendment claim." *In re Stevenson*, 40 A.3d at 1225 n.12.

Later, in a single-judge reported opinion from this Court, *In re Gordon*, the judge denied the petition to set aside the nomination petition of a candidate for the Democratic Party Nomination for Representative in the United States Congress.[9] In doing so, the judge, by way of a brief explanation, stated that she "rejected, "based on [*Buckley*], [*Morrill*], and [*In re Stevenson*], the challenges to . . . circulator not registered to vote[,] circulated registered outside the District[,] and circulator not registered at address." 141 A.3d at 613. Candidate argues that *In re Gordon*, expanded the holdings in *Morrill* and *In re Stevenson*, both of which dealt with the registration and address requirements of circulators of nomination papers of Green Party and Independent Party candidates that do not participate in a primary election, to the nomination petitions filed by the candidates of major political parties desiring to make it to the primary election.

Candidate argues that given this case law, if "a circulator can be a person who is not registered to vote at all, there is no logic for preventing a registered voter,

_____

[9] "A reported opinion of a single judge . . . in an election law matter may be cited as binding precedent in an election law matter only." Section 414(d) of the Commonwealth Court Internal Operating Procedures, 210 Pa. Code §69.414(d).

who happens to not be registered as a Democrat, to circulate a Democratic petition." (Mem. Law at 3.) Candidate asserts that, when it comes to the political affiliation of a petition circulator, the Commonwealth does not have a sufficient interest in maintaining a line of party division and prohibiting an individual who is registered as a Republican from serving as a circulator for a candidate that is a Democrat.

The Court disagrees. In the situation where a would-be circulator is registered with a political party that is different from the political party of which the candidate is seeking nomination, the First Amendment rights to free speech and association are circumscribed by the countervailing First Amendment right of the political party to exclude the would-be circulator from its association. *See Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 215 n.6 (1986) (referencing cases where the United States Supreme Court "considered claims by nonmembers of a party seeking to vote in that party's primary despite the party's opposition," stating that in this "class of cases, the nonmember's desire to participate in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications," and finding that an "analytically distinct" situation occurs "when there is no conflict between the associational interests of members and nonmembers."); *see also Clingman v. Beaver*, 544 U.S. 581, 588-89 (2005) (plurality) (holding that a state's "semiclosed primary system," which did not allow party members to vote in another party's primary, imposed only a minor burden on associational rights and did not run afoul of the First Amendment, and stating "[T]he Republican and Democratic voters who have brought this action do not want to associate with the [Libertarian Party], at least not in any formal sense. They wish to remain registered with the Republican, Democratic, or Reform parties, and yet to assist in selecting the Libertarian Party's candidates for the general election . . . . However, a

10

voter who is unwilling to disaffiliate from another party to vote in the [Libertarian] primary forms little 'association' with the [Libertarian Party]—nor the [Libertarian Party] with him."); *California Democratic Party v. Jones*, 530 U.S. 567, 577 (2000) (concluding that a state law violated the political association's right to exclude because the law "force[d] political parties to associate with—to have their nominees, and hence their positions, determined by—those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival").

In *De La Fuente*, a federal district court concluded that the registered party-line restriction contained in section 909(a) was constitutional under *Buckley*. In doing so, the court essentially adopted the reasoning of the Second Circuit in *Maslow v. Board of Elections in City of New York*, 658 F.3d 291 (2d Cir. 2011). In that case, the Second Circuit addressed a statutory provision nearly identical to section 909(a), dubbed the "Party Witness Rule," distinguished *Buckley* and its previous decision in *Lerman* (which was a major basis for the *Morrill* court's declaration that the in-district residence requirement was unconstitutional), and concluded that the Rule was constitutional under the First Amendment.

Embodied in the statutory law of the State of New York, the Party Witness Rule restricts circulators to "enrolled voter[s] of the same political party as the voters qualified to sign the petition," i.e., "the party in whose primary the candidate seeks to run." 658 F.3d at 294 (citation omitted). Notably, the Second Circuit in *Maslow* observed that the state legislature "enacted the Party Witness Rule in the early 1950s, apparently in response to incidents of 'party raiding,' whereby members of one party would actively participate in the primary of a rival party in the hope of influencing that party's candidate nomination and thus improving their own chances in the general election." *Id.*

11

In *Maslow*, a civil rights action was filed by candidates for the Democratic Party who wanted to use as circulators who were not registered as Democrats, and also by circulators who collected signatures that were invalidated under the Party Witness Rule because they were not registered in the same party as the candidates. Citing a long line of Supreme Court precedent emphasizing "that the First Amendment guarantees a political party great leeway in governing its own affairs," the *Maslow* court concluded that "a political party's associational right to exclude forecloses the possibility that non-members have an independent First Amendment right to participate in party affairs." 658 F.3d at 294 (internal quotation marks and citations omitted). Based upon the case law from the United States Supreme Court, the Second Circuit deduced that it was "clear" that "the First Amendment affords political parties an autonomy that encompasses the right to exclude non-members from party functions, and in no area is the political association's right to exclude more important than in the process of selecting its nominee." *Id.* at 296. To bolster its conclusion, the Second Circuit quoted the pithy and unequivocal words of Justice Scalia, writing for a majority of the United States Supreme Court in *Jones*: "As for the associational 'interest' in selecting the candidate of a group to which one does not belong, that falls far short of a constitutional right, if indeed it can even fairly be characterized as an interest." 658 F.3d at 296-7 (quoting *Jones*, 530 U.S. at 595 n.5.)

On this foundation, the Second Circuit framed the rationale for its holding as follows:

> The Party Witness Rule imposes little or no burden on [p]laintiffs' First Amendment rights. Although [p]laintiffs claim that the Rule operates as a restraint on political speech, at bottom they assert an associational right to have non-party members participate in party primary elections. Because political parties have a strong associational right to exclude non-members from their candidate nomination process,

[p]laintiffs have no constitutional right pursuant to which such participation may be effected.

658 F.3d at 296.

The court then concluded:

As [p]laintiffs have not demonstrated any non-trivial burden to their First Amendment rights, we need not closely analyze New York's justification for the Party Witness Rule. We only note that the State has a legitimate interest in protecting its political parties from party raiding, *see* [*Rosario v. Rockefeller*, 410 U.S. 752, 760-62 (1973)], which was clearly contemplated by members of the State Legislature when the Rule was adopted. The Party Witness Rule helps combat party raiding by denying hostile non-party elements access to one part of a political party's nomination process.

*Id.* at 298.

In reaching this conclusion, the court in *Maslow* rejected the plaintiffs' argument that the party membership restriction overly burdened the plaintiffs' right to engage in political speech through the circulation of petitions. While noting that the decisions in *Buckley* and *Lerman* "recognize petition circulating as a form of highly protected political speech," the Second Circuit distinguished those cases, explaining: "[T]he [p]laintiffs are only restrained from engaging in speech that is inseparably bound up with the [circulator] plaintiffs' association with a political party to which they do not belong. As plaintiffs have no right to this association, they have no right to engage in any speech collateral to it." *Id.* at 298 (citation omitted). In addition, the Second Circuit proclaimed that its decision was consistent with *Lerman*, stating: "The subscribing witness residency requirement at issue in [*Lerman*] was as much of an impediment to the exercise of political parties' associational rights as it was to the exercise of the individual candidates' rights. In other words, the associational rights of the candidates and the parties were aligned." *Id.* at 297 n.4.

13

In *De La Fuente*, the plaintiff was a candidate in the 2016 election for President of the United States, seeking the Democratic nomination during the primary, and registered Republicans were prevented from circulating his nomination petitions pursuant to section 909(a). The plaintiff filed a civil rights complaint, contending that section 909(a) transgressed the rights of the First Amendment. Following the reasoning of the court in *Maslow*, the Pennsylvania federal district court in *De La Fuente* distinguished *Buckley* and rejected the argument that the section 909(a) constituted a severe burden on core political speech. In upholding the constitutionality of section 909(a), the court stressed that the First Amendment guarantees "the freedom to identify the people who constitute the association, and to limit the association to those people only," and reiterated that "a corollary of the right to associate is the right not to associate." 261 F. Supp. 3d at 554 (quoting *Jones*, 530 U.S. at 574).

The court then added:

> [T]he petitions being circulated in *Buckley* were ballot initiative petitions intended to be an alternative method of law-making, not petitions for the selection of party nominees, as in the present matter. We cannot overlook the important associational rights inherent to the nomination process. The Supreme Court has noted that "the associational 'interest' in selecting the candidate of a group to which one does not belong . . . falls far short of a constitutional right, if indeed it can even fairly be characterized as an interest." [*Jones*, 530 U.S. at 595 n.5.]

> Plaintiff's Complaint indicates that he wanted Republicans to be permitted to circulate petitions for his nomination as the Democratic candidate. To the extent that [section 908(a)] reflect[s] the self-selected associational limitations of the Republican and Democratic parties, [it is] constitutional. Plaintiff has not pled any facts suggesting that Pennsylvania has interfered with the associational wishes of either party.

261 F. Supp. 3d at 555. On these bases, the court in *De La Fuente* dismissed the plaintiff's First Amendment claim for failing to plead sufficient facts to state a cause of action.

Upon review, the Court finds the reasoning of the courts in *Maslow* and *De La Fuente* persuasive and sufficient to provide the sturdy grounds and "logic" that Candidate maintains is necessary to differentiate this case from *Morrill* and *In re Gordon*.

Initially, the Court assumes, without deciding, that the courts in *Morrill* and *In re Gordon* correctly concluded that unregistered voters who seek to be circulators, and the parties for which they seek to circulate, have a First Amendment right to enter into political association and that circulation of nomination petitions in this context is core political speech subject to strict scrutiny. However, when a would-be circulator is not registered to vote, the would-be circulator has not "affiliated" with any particular party for purposes of election law. To ensure that these individuals are not excluded entirely from electoral participation, it makes sense that the First Amendment would allow them to contribute in the nomination process as a circulator for a candidate of one party. *See also City of Mobile v. Bolden*, 446 U.S. 55, 77 (1980) (recognizing the constitutional right "to equal participation in the electoral process"). In other words, because the would-be circulator is not registered to vote, the would-be circulator has not yet formally exercised the fundamental right to associate with the political party of his or her choice, *see Kusper v. Pontikes*, 414 U.S. 51, 57 (1973), and the political party, in these circumstances, is exercising its right of association by expanding its base to include individuals who have not made a commitment to a specific political party and may end up registering with the party, *see Tashjian*, 479 U.S. at 214. In short, when the unregistered voter circulates a nomination petition for

15

a party, the circulator and the party do not have a conflict of associational interests. When a registered voter resides outside of the district in which the candidate is running for office, and both are registered with the same party, the associational interest are in unison.

But this legal issue is entirely different, and takes on a new dimension, when an individual is registered to vote and is "affiliated" with a specific party, but desires to circulate a nomination petition for a candidate that belongs to a different party. In this scenario, the associational interests of the circulator and the party are not aligned, but, rather, stand in contradiction. It is at this point that the case law governing the associational rights of the Republican and Democratic parties to exclude the other party's members from participating in the nomination process is squarely applicable and greatly diminishes, if not evaporates, the free speech rights of the would-be circulator. Pursuant to the statute and case law, the entire group of potential circulators for Candidate consists of all individuals who are registered to vote as Democrats, even if they reside outside of the boundaries of the candidate's geographic district, and also any individual who is unregistered to vote. Nonetheless, Candidate asserts that section 909(a) limits the number of potential circulators for Democrats by eliminating those individuals who are registered to vote as a Republican. This fact, however, is legally immaterial. Neither *Buckley*, *Morrill*, nor *In re Gordon* mandate, let alone remotely suggest, that the First Amendment dictates their inclusion, while *Maslow*, *De La Fuente*, and an entire body of precedent from the United States Supreme Court uphold and, in some instances, command their exclusion.

Adhering to the decisions in *Maslow* and *De La Fuente*, the Court concludes that section 909(a) imposes only a trivial burden upon Candidate's or the circulator's First Amendment rights of free speech and association. This slight impact

16

on the First Amendment, in turn, is justified by the Commonwealth's legitimate interest in preventing party raiding, as that concept is described and discussed by the court in *Maslow*, and the Commonwealth's legitimate interest in retaining the importance of party affiliation and cohesion. *See Clingman*, 544 U.S. at 595-96 (stating that the State has legitimate interests "in preventing party raiding" and in "retaining the importance of party affiliation," which "aids in parties' electioneering and party-building efforts"). As an aside, if the Court were to hold otherwise, and conclude that section 909(a) is unconstitutional, then a circulator registered as a Republican could conceivably circulate petitions for both the Republican and Democratic Parties during the same election cycle, thereby creating the potential for voter confusion while undermining the Commonwealth's compelling interest in maintaining the cohesion of political parties. *See also Citizens for John W. Moore Party v. Board of Election Commissioners of the City of Chicago*, 794 F.2d 1254, 1260-61 (7th Cir. 1986) (finding that the State has a "compelling" interest in a rule that "promotes the cohesion of political parties" and expounding: "Circulators engage in personal, often high-pressure, solicitation. There is always some potential for deceit; there is also a potential for confusion if a circulator identified as the agent of one party suddenly solicits signatures for another party or an independent candidate.")

Therefore, the Court concludes that the same-party requirement of section 909(a) is constitutional under the First Amendment. As such, the 14 signatures obtained by a registered Republican circulator for Candidate, who is seeking the Democratic Nomination for Office of State Representative, must be stricken pursuant to the plain language of Section 909(a).

After striking these 14 signatures, Candidate is left with 304 signatures.

17

<u>Individual Line Challenges</u>

We now proceed to the Objectors' individual line challenges to the nomination petition. The Election Code should be construed liberally "so as to not deprive an individual of his right to run for office, or the voters of their right to elect a candidate of their choice." *Ross Nomination Petition*, 190 A.2d 719, 720 (Pa. Cmwlth. 1963). The purpose of the Election Code is to protect, not defeat, a citizen's vote. *Dayhoff v. Weaver*, 808 A.2d 1002, 1006 (Pa. Cmwlth. 2002), *appeal denied*, 819 A.2d 548 (Pa. 2003). Furthermore, nomination petitions are presumed to be valid, and objectors bear the heavy burden of proving that a candidate's nomination petition is invalid. *In re Nomination Petition of Shimkus*, 946 A.2d 139, 141 (Pa. Cmwlth. 2008).

Where this Court is not convinced that challenged signatures are other than genuine, the challenge is to be resolved in favor of the candidate. *In re Nomination of Flaherty*, 770 A.2d 327, 331 (Pa. 2001). However, we are mindful that we must strike a balance between the liberal purposes of the Election Code and the provisions of the Election Code relating to nominating petitions that are necessary to prevent fraud and to preserve the integrity of the election process. *Shimkus*, 946 A.2d at 154. This Court is "[e]ntrusted with the responsibility of protecting the Commonwealth's compelling interest in preserving the integrity of the election process." *In re Nomination Papers of Carlson*, 430 A.2d 1210, 1212 (Pa. Cmwlth.), *aff'd*, 430 A.2d 1155 (Pa. 1981). The Supreme Court may reverse our order concerning the validity of challenges to a nomination petition only if our findings of fact are not supported by substantial evidence, if we abused our discretion, or if we committed an error of law. *In re Nader*, 858 A.2d 1167, 1177 (Pa. 2004).

In support of the stated objections, both Objectors and Candidate presented the sworn testimony of Shari A. Brewer, the Director of the Butler County

18

Bureau of Elections and a SURE systems operator (Operator). During Operator's testimony, she accessed the voter registration record of the signatures challenged by Objectors in the SURE system and projected them onto a screen for examination by the Court and the parties. Candidate testified on his own behalf and also attempted to rehabilitate numerous signatures with elector affidavits.

We begin by noting that, during the course of the hearing, Objectors withdrew three challenges to individual signatures after Operator accessed each signer's voter registration record to verify that each was a registered member of the Democratic party, and reside at an address located in the 12th Legislative District and that each signer's signature matched the signature appearing on the relevant registration card. As a result, the Court found the signatures appearing at page 3, line 17; page 5, line 1; and page 17, line 19, to be valid, still leaving Candidate with 304 valid signatures and 9 line challenges remaining.

Objectors then challenged the signatures appearing at page 9, lines 1, 2 and 3, on the basis that each signature was dated February 12, 2018—one day prior to the opening of the petition period. To rehabilitate those signatures, Candidate testified on his own behalf, representing that he was present, as the circulator, when the three individuals signed the petition, and that he obtained the signatures on the evening of Saturday, February 17, 2018, at a fundraising event held at Quality Gardens. (Candidate's Exhibit No 1.) Candidate also presented notarized affidavits of the individuals whose signatures appear at page 9, lines 1 and 3. (Candidate's Exhibit Nos. 2, 3.) The affidavits specified the date on which each individual signed the petition, February 17, 2018, and averred that each individual mistakenly dated his/her signature as February 12, 2018.

19

Objectors lodged an objection to the admission of the affidavits on the basis that they were impermissible hearsay. In response, with respect to each affidavit, Candidate credibly testified that he personally spoke to each signatory, explained the facial defect related to his or her signature on the petition, asked each elector if he or she would sign the affidavit to cure the facial defect, and witnessed the completion of the affidavit by each individual.

Section 977 of the Election Code provides in relevant part that "material errors or defects apparent on the face of the nomination petition" are amendable, after hearing, at the discretion of the court. 25 P.S. §2937; *In re Nomination of Delle Donne*, 779 A.2d 1, 6 (Pa. Cmwlth.), *aff'd*, 777 A.2d 412 (Pa. 2001). In the case of *In re Nomination Petition of Vodvarka*, 994 A.2d 25 (Pa. Cmwlth. 2010), this Court accepted rehabilitation evidence in the form of affidavits to overcome facial challenges to six signatures where the objections were based on missing information, specifically, the date of signature. In the affidavits, the signing electors stated that they had erroneously written a zip code instead of a date and provided the date on which they had signed the nomination petition.

In the present case, each affidavit submitted by Candidate includes not only the information upon which the challenge is based, but also the entirety of the information required by the Election Code. As previously noted, Candidate credibly testified that he presented each affidavit to the elector who signed it and witnessed each signature. Because the affidavits were corroborated by Candidate's testimony, and in keeping with the purpose of the Election Code, the Court overruled the objections, and found the three signatures appearing at page 9, lines 1, 2, and 3, to be valid. *See In Re Nomination Petition of Kristofer J. Wiegand*, (Pa. Cmwlth., No. 165 M.D. 2014, filed April 15, 2014) (unreported), slip op. at 9-10 (rejecting hearsay challenge to an

20

elector's affidavit where the information in the affidavit was sufficient to rehabilitate the amendable error and was corroborated with other evidence).[10]  Thus, Candidate maintained 304 valid signatures and 6 signature challenges remained.

Next, Objectors challenged two individual signatures (page 16, line 11; page 17, line 12) on the basis that the signers were not registered voters at the time they signed the petition.  With respect to these signatures, Operator attempted to locate each signer's voter registration card, but was unsuccessful.  Operator also searched for those voter registration cards using the addresses listed on the petition, but the results showed that, in each instance, the signer did not reside at the stated address.  Candidate offered no other evidence to rehabilitate the signatures.  Therefore, the Court sustained Objectors' challenge and found the signatures appearing at page 16, line 11, and page 17, line 12, to be invalid.  Candidate now maintained 302 valid signatures, with 4 signature challenges remaining.

Also, Objectors challenged the validity of the signature at page 18, line 2, on the basis that the signer was not a registered voter in the 12th Legislative District.  As explained above, section 908 of the Election Code requires that each signer be a registered voter in the relevant district at the time the nomination petition is signed.  *Id.* In an attempt to rehabilitate this signature, Candidate presented the affidavit of the signer.  However, he offered no evidence to corroborate the affidavit, or to otherwise

---

[10] Candidate testified that he was unable to obtain an affidavit signed by the elector whose signature appears at page 9, line 2.  However, Candidate credibly testified that this signer executed the petition as the same time as the other two electors from whom affidavits were obtained.  We concluded that the signature at page 9, line, 2 was valid because the fact that it was situated between the other two challenged signatures obtained on a single date supports a common sense deduction that the challenged signature also occurred on the same date and under the same circumstances. *See In re Nomination Papers of Robertson*, 55 A.3d 1044, 1044 (Pa. 2012) ("[T]he interspersal of the challenged signatures among others dated in 2012 supports a common sense deduction that the challenged signatures also occurred in that year and negates any concern that the omissions call into question the identity of the signatory or compromise the integrity of the election process.")

rehabilitate the defective signature. In fact, Candidate's testimony brought to light a second basis upon which Objectors could challenge the signature: Candidate testified that, because the signer was on a business call at the time Candidate visited his residence, signer's wife completed the information listed on the petition on his behalf. Candidate presented no evidence to rehabilitate either that deficiency or the deficiency raised by Objectors' initial challenge. Thus, because the signer was not a registered and enrolled member of the Democratic party in the 12th Legislative District at the time he signed Candidate's nomination petition, and because signer did not complete the petition on his own behalf, the signature appearing at page 18, line 2, was stricken as invalid. Candidate now maintained 301 valid signatures and 3 signature challenges remained.

Next, Objectors challenged the validity of the signature at page 12, line 16, on the basis that line information was omitted (LIO). The elector who signed Candidate's petition at page 12, line 16 did not include the date on which he executed his signature. Section 908 of the Election Code provides that "[e]ach signer of a nomination petition . . . shall add his residence, giving city, borough or township, with street number, if any . . . and the date of the signing, express in words or numbers." 25 P.S. §2868. The omission of any part of this required information is a basis for finding the signature invalid. *In re Nomination Petition of Silcox*, 674 A.2d 224 (Pa. 1996).

In response to the challenge, Candidate testified as the circulator of the petition, representing that he visited the signer's residence on February 26, 2018, and that the signer's wife also signed the petition during the same visit (at page 12, line 15). Candidate also presented the affidavits of the signer and his wife. (Candidate's Exhibit Nos. 4, 5.) The affidavit of signer's wife affirmed that it is her signature that appears on Candidate's petition at page 12, line 15, below the signature of her husband; that

22

she signed the petition on February 26, 2018; that her address is correct; and that she mistakenly wrote her zip code in the space where the date should have been written. (Candidate's Exhibit No. 4.) The signer's affidavit represented that he was a registered Democratic elector who signed Candidate's petition at page 12, line 15, and was present when his wife signed the same petition at page 12, line 16. (Candidate's Exhibit No. 5.) Because Candidate's testimony corroborated the information contained in the affidavits, the Court admitted the affidavits into evidence, and found the signature at page 12, line 16 to be valid. This maintained the total number of valid signatures appearing on Candidate's nominating petitions at 301, with 2 remaining challenges to individual signatures.

Objector challenged the signature at page 18, line 5, on the basis that the signer was not a registered voter at the time she signed the petition. Operator successfully located the elector's voter registration card. The registration card confirmed that the signer was a registered Democrat residing in the 12th Legislative District at the time she signed Candidate's petition. Objectors conceded their challenge regarding the voter's registration. However, at the hearing, Objectors asked to view the signature on the registration card to compare it to the signature appearing on the petition. After comparing the signatures, Objectors amended their challenge to assert that the signature on the petition was not that of the voter. The Court deferred ruling on this challenge to permit the parties to obtain a copy of the signer's voter registration card from the County, as the image viewed through the SURE system was not clear.

After the hearing, the parties proffered a photocopy of the voter's registration card. The copy was no clearer than what was available on the SURE system. The Objectors, who carry the burden of establishing their challenge, provided no other evidence to support their challenge to the validity of the signer's signature.

Therefore, based upon the weight that the Court affords to the evidence presented, and the fact that Candidate was not given any prior notice of the challenge to enable him to obtain testimony or other evidence to rehabilitate the signature, we overrule the challenge and find the signature appearing at page 18, line 5, to be valid. At this time, Candidate maintained 301 valid signatures, with 1 signature challenge remaining.

Finally, Objectors challenged the validity of the signature at page 13, line 9, on the basis that the signer was not a registered voter in the 12th Legislative District at the time she signed the petition. Specifically, the signer executed the petition on February 21, 2018, and Objectors contend that she was not a registered voter until March 4, 2018. Section 908 of the Election Code provides that "[e]ach signer of a nomination petition shall sign but one such petition for each office to be filled, and shall declare therein that he is a registered and enrolled member of the party designated in such petition. . . ." 25 P.S. §2868. Operator accessed the signer's voter registration card, which showed that signer was a registered voter in the District as of February 22, 2018. However, Operator could not testify as to when the signer submitted her registration and what delay in processing, if any, was caused by the Bureau of Elections itself.

During the hearing, Candidate provided no evidence to demonstrate that the signer was a registered Democrat in the 12th Legislative District on February 21, 2018, or to otherwise rehabilitate this signature. Even though Operator acknowledged that the registration application could have been submitted prior to its processing on February 22, 2018, no evidence of record exists to rebut the information stated on the voter's registration record. The Court deferred its determination regarding the validity of the signature. After a further review of the evidence, we must sustain Objectors'

challenge and find the signature at page 13, line 9 to be invalid.  Therefore, Candidate was left with 300 valid signatures and no signature challenges remaining.

**Conclusion**

Here, Candidate began with 338 signatures on his nomination petition, and Objectors lodged challenges to 46 of those signatures.  Out of the 46 challenges, the parties stipulated that 20 signatures were invalid.  With respect to the remaining 26 challenges, the Court concluded that 18 signatures were invalid (14 signatures pursuant to the global challenge and 4 signatures pursuant to individual line challenges) and determined that 8 signatures were valid.   Based on the Court's calculations, Objectors have successfully challenged 38 of the 338 signatures on the nomination petition (20 through stipulation and 18 at the hearing), and, at the end of the contest, Candidate is left with 300 valid signatures appearing on his nomination petition.

Because Candidate maintained 300 valid signatures on his nomination petitions, he satisfied the requirement of section 912.1(14) of the Election Code and his name shall remain on the ballot as a candidate for the Democratic Party Nomination for State Representative in the 12th Legislative District in the General Primary Election to be held on May 15, 2018.


_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: The Nomination Petitions of :
Daniel B. Smith, Jr. as a Democratic :
Candidate for State Representative :
in the 12th Legislative District : No. 138 M.D. 2018
:
Petition of: Rizwan Mahmood and :
Kevin R. Costello :

## *ORDER*

AND NOW, this 29th day of March, 2018, it is hereby ordered that:

1. The Petition to Set Aside the Nomination Petition of Daniel B. Smith, Jr., is denied. The Secretary of the Commonwealth is directed to certify Daniel B. Smith as a candidate for the Democratic Party Nomination for State Representative in the 12th Legislative District in the General Primary Election to be held on May 15, 2018.

2. Objectors Rizwan Mahmood and Kevin R. Costello shall bear the cost of the stenographer. Otherwise, the parties shall each bear their own costs.

3. The Prothonotary is directed to notify the parties and their counsel of this order and to also certify a copy thereof to the Secretary of the Commonwealth of Pennsylvania forthwith.

_____
PATRICIA A. McCULLOUGH, Judge